**SOUTHERN REALTY CORPORATION et al. v. McCALLUM, Secretary of State of Texas, et al.**

No. 6827.

Circuit Court of Appeals, Fifth Circuit.

July 7, 1933.

Paul Carrington, of Dallas, Tex., Ben H. Powell, of Austin, Tex., and Robert Sansom, of Fort Worth, Tex., for appellants.

James V. Allred, Atty. Gen., of Texas, and Sidney Benbow and F. O. McKinsey, both of Austin, Tex., for appellees.

Before BRYAN, FOSTER, and SIBLEY, Circuit Judges.

SIBLEY, Circuit Judge.

In 1930 (Acts 1930 [5th Called Sess.], c. 68) the Texas corporate franchise tax law was amended and eighteen corporations claiming each to represent a class situated similarly to itself united in a bill in the District Court to enjoin the secretary of state, the Attorney General, and the treasurer from enforcing the law because of its conflict with the commerce clause of the Federal Constitution and the due process and equal protection clauses of the Fourteenth Amendment. Each had made the required report of facts for the assessment of its tax, and had paid it under protest into what is called the treasurer's "suspense account" to await determination of its disposition. No interlocutory injunction was asked. The District Judge accordingly heard the case, and in a lucid opinion sustained the law. 1 F. Supp. 614. On this appeal no question is raised of federal jurisdiction or jurisdiction in equity or misjoinder, but the only questions are of the constitutionality of the attacked statute on its face and as applied to the various complainants.

By article 7084 of Rev. Stats. of 1925, as amended in 1930 (Acts 1930 [5th Called Sess.] c. 68, § 2), with exceptions not now material, every domestic and foreign corporation chartered or authorized to do business in Texas is required on May 1st of each year to pay in advance to the secretary of state a franchise tax for the year following that date "based upon that proportion of the outstanding capital stock, surplus and undivided profits, plus the amount of outstanding bonds, notes and debentures, other than those maturing in less than a year from date of issue, as the gross receipts from its business done in Texas bears to the total gross re-

ceipts of the corporation from its entire business." The tax is 60 cents per $1,000 on the first $1,000,000, above that 30 cents per $1,000. The tax is to be computed from the reports required under article 7087 and article 7089 as amended by Acts 1930 [5th Called Sess.], c. 68, § 3. The latter article requires between January 1st and March 15th a sworn report from the corporation giving the capital stock paid in, the surplus and undivided profits or deficit, if any, the amount of bonds, notes, and debentures not maturing within a year from date, and the total gross receipts from all sources and the gross receipts from business done in Texas the preceding calendar year, which facts are directly necessary to compute the tax; and, in addition, information as to the cash value of all gross assets, the par value of authorized stock, current and short-term indebtedness, dividends paid, and the other countries or states where business is done, which information could be needed only to check the correctness of the main facts. A foreign corporation making its first report is to make it at the end instead of at the beginning of the first year's business, plainly because it could not earlier be known what its annual Texas receipts would be. Article 7087 provides that the secretary of state may require any officer of the corporation to file an affidavit of the facts concerning the amount of surplus and undivided profits, either to determine the amount of the first franchise tax payment or the correctness of any report, and until fully satisfied as to the amount of such surplus and undivided profits he shall not grant articles of incorporation to a domestic corporation or issue a permit to do business to a foreign corporation or accept the franchise tax. Failure to make report or to pay the tax is penalized in money, and after notice, if the full tax is not paid by July 1st, the right to do business in the state is forfeited and a domestic charter may be annulled. Article 7095 contains these provisions: "The Attorney General shall bring suit therefor against any such corporation which may be or become subject to or liable for any franchise tax or penalty under this law," venue being fixed in certain courts; and "such courts shall also have authority to restrain and enjoin a violation of any provision of this chapter."

The tax is not laid on property or on income, though both are regarded in measuring it. It is laid on the privilege granted to the corporation, whether domestic or foreign, to do business for one year in Texas with the capital set-up which it has chosen to use.

The tax for this opportunity to do the year's business is directly measured by the business capital about to be used rather than by the income which it may afterwards appear was realized. The origin, form, and location of that capital, whether in or out of the state, is unimportant, provided it is to contribute to the corporation's business power within the state. When the corporation is to do business in other states also, avoidance of a trespass on interstate commerce or on that done beyond the territorial jurisdiction of the taxing state is secured by apportioning the business potency of the corporation represented by its business capital according to the business actually done during the preceding calendar year in the taxing state as indicated by gross receipts, compared with all its business everywhere. Authorized but unissued capital stock which condemned the law as to foreign corporations in Looney v. Crane Co., 245 U. S. 178, 38 S. Ct. 85, 62 L. Ed. 230, is eliminated as a factor in computing the tax, but a novel one has been introduced, to wit, the amount of permanent borrowed capital represented by bonds, notes, or debentures running for a year or more from date. That a state may impose such a franchise or business privilege tax, and may measure it by the capital stock and surplus used by the corporation in its business or by its income therefrom, although business is done in more states than one, without unconstitutional interference with interstate commerce or other federal prerogative and without a taxing of property beyond the jurisdiction of the taxing state, when the capital by which the tax is measured is reasonably apportioned according to the business there done, is settled by many decisions. Educational Films Corporation v. Ward, 282 U. S. 379, 51 S. Ct. 170, 75 L. Ed. 400; Western Cartridge Co. v. Emmerson, 281 U. S. 511, 50 S. Ct. 383, 74 L. Ed. 1004; International Shoe Co. v. Shartel, 279 U. S. 429, 49 S. Ct. 380, 73 L. Ed. 781; National Leather Co. v. Massachusetts, 277 U. S. 413, 48 S. Ct. 534, 72 L. Ed. 935, and cases cited. With respect to the novel inclusion in the measure of the tax of long-time indebtedness, it is here made to appear that corporations had resorted to the device of issuing an insignificant amount of capital stock but a large amount of bonds, thus arranging for a permanent capital which would not increase the tax under the former laws. The Legislature deemed that such capital, equally with that raised by common or preferred stock, was employed in the corporate business and tended to increase it and make it profitable, and equally required protection at the hands of the state; and so ought equally to enter into the measure of the tax. This conclusion expressed in the statute of 1930 is not arbitrary and is within legislative power. The exclusion of short-time loans, that is, those for less than a year, is also not arbitrary. If such are actually repaid within the year, they have not been capital employed during the whole tax period. If renewed throughout the year, they may serve to provide working capital just as though originally for a year, but in truth they are no permanent capital, but the indulgence is at the will of the creditor and generally purchased by a high rate of interest. A line of cleavage was proper to be made at some point, and one year, the period which the tax is to cover, was not an unreasonable place to fix it. Similarly, where the corporation accumulates surplus or undivided profits, it is apparent that its business opportunity is enhanced thereby, and it is just that this element also should be considered as part of the year's business capital. Upon its face the tax scheme is sustainable.

But some of the complainants have been unsuccessful and have lost the capital originally represented by their bonds or by their capital stock. Yet the law, providing for no deduction of a deficit measures their tax as though the loss had not occurred. A denial of equal protection is asserted. In effect, such corporations are dealt with as a separate class. No heed is paid to what capital they really have to do business with, but the greater their losses the larger the handicap of the tax exacted. The discrimination thus arising between corporations whose assets equal or exceed their capital and debts and those whose capital has been impaired by losses is undeniable. Yet we think it is not arbitrary, but may be rested upon a sound principle. If the losses are so large as to leave assets less than the bonded indebtedness, as is shown by one complainant, that corporation is insolvent, and ought not to be in business but in bankruptcy. If the capital stock is only impaired, it ought to be reduced accordingly, and the corporation ought not to pretend to its full capital. Not only may customers be deceived thereby, but the likelihood of litigation and failure may make the state's protection of the business more costly. The tax in disregard of the deficit is justifiable as a discouragement of the continuance of their business in the state by corporations foreign or domestic which are insolvent or likely to become so. Such repression is the policy of protective tariffs, and the tax on notes of

state banks upheld in Merchants' Nat. Bank of Little Rock v. United States, 101 U. S. 1, 25 L. Ed. 979; Veazie Bank v. Fenno, 8 Wall. 533, 19 L. Ed. 482.

A further want of equal protection is urged, in that foreign corporations do not for the first year have to make a report or pay the tax until the end of the tax year. This difference is not arbitrary because such corporations customarily have business in other states, and no basis can be established for apportioning their capital according to their Texas business until some Texas business is done. There may, of course, be foreign corporations who make their business home in Texas and do no business elsewhere, so that no apportionment would be needed, but the possible exception would not invalidate the otherwise reasonable rule. The suggestion that the foreign corporation might withdraw from Texas during the first year and evade the tax is without weight. Most likely the state could assert a lien for the tax though it had not yet been computed, but, if the tax be lost, other taxpayers ought not to be released from their obligations. Such is not the usual result when some taxpayer evades his tax.

Unequal protection is not to be found in the provision that no-par stock shall be taken at the value received for it at the time of its issuance; information thereabout being required of corporations having such stock. This treatment of no-par stock parallels as nearly as possible the taking of other stock at par, and is not arbitrary or unreasonable. Compare International Shoe Co. v. Shartell, 279 U. S. 429, 49 S. Ct. 380, 73 L. Ed. 781, where an arbitrary value was validly put on no-par stock, and New York v. Latrobe, 279 U. S. 421, 49 S. Ct. 377, 73 L. Ed. 776, where a flat rate tax was successfully imposed on it.

A want of due process is urged, in that the act provides for no hearing of the taxpayer before the amount of his tax is fixed, and for no review afterward, citing Central of Georgia Ry. Co. v. Wright, 207 U. S. 127, 28 S. Ct. 47, 52 L. Ed. 134, 12 Ann. Cas. 463. In reply, it is said that he fixes his own tax and no hearing is due him. The reply is good. The act nowhere authorizes the secretary to assess the tax. It requires the taxpayer to pay it on a certain basis and to disclose the facts constituting the basis in a report to the secretary. It is true that the gross receipts in and out of Texas and the value of assets where a surplus exists involve disputable facts, but authority is given to no officer to correct the figures reported. The

additional information required in the regular report or obtained by affidavit under article 7087 or otherwise may be useful to induce a true report or to found a prosecution for false swearing in making an untrue one. We do not decide whether, as is contended, article 7087, which speaks of determining the correctness of the report and satisfying the secretary of the amount of the surplus, applies only to the first year of business in Texas. If applied to all reports in all years where a surplus is involved, it only results in the secretary not accepting the tendered franchise tax. He cannot enforce his views by an assessing and distraining. If because of a dispute over surplus he rejects the tax, the Attorney General must file suit for its collection under article 7095. Presumably in that suit a full hearing could be had as to the matters in dispute. In cases where article 7087 is not applicable, dispute might arise as to the proportion of intrastate business to all business, or as to the amount of long-time indebtedness or the like. In such a case the secretary no doubt would accept what was offered on account of the tax, having the Attorney General to bring suit for the difference claimed. But it is said that, if the taxpayer lost in the suit, the penalties imposed for not paying in full by July 1st, including the cancellation of its permit to do business, are so drastic as to deter the taxpayer from a contest. Ex parte Young, 209 U. S. 123, 28 S. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764. The monetary penalties are not unusually severe, and no criminal punishment is provided. It is quite possible that the provision for forfeiting the right to do business in the state "to be consummated without judicial ascertainment by the Secretary of State entering upon the margin of the record kept in his office relating to such corporation the words 'right to do business forfeited,'" with the other heavy consequences detailed in the statute, may itself be void for want of due process and thus harmless. This result would not destroy the remainder of the statute. It contains a provision that the unconstitutionality of one of its parts is not to affect the others. In the case of the Georgia tax statutes dealt with in Central of Georgia Ry. Co. v. Wright, supra, the striking down for want of due process of the provision for ex parte assessment of omitted property did not affect the remainder of the system. Or it may reasonably°be held that the provision of article 7095 giving the courts "authority to restrain and enjoin a violation of any provision of this chapter" is available to the taxpayer as

a consent by the state that its officers may be prevented from making a wrong demand as to the tax or from improperly entering the memorandum of forfeiture above mentioned. A court of equity could thus hold matters in statu quo until it determined who was right in any dispute over the tax. The state courts have not yet construed the statute in these respects, and, since their construction is controlling, the federal court should go no further than is necessary in the case before it. The secretary has raised no issue of any sort with any complainant here with respect to the amount of his tax, but has accepted in each case the report made and the tax offered. No penalty is threatened; there is a stipulation that none will be asserted. As concerns these litigants, there has been no denial of due process. They have no cause to complain. St. L.-S. F. Ry. Co. v. Middlekamp, 256 U. S. 226, 41 S. Ct. 489, 65 L. Ed. 905.

The facts relating to each of the eighteen complainants need not be stated in detail. The contention of each that the tax is invalid as to him is answered by what has been said. It is true that a taxing statute may be valid in its general application, but unconstitutional in its operation on some particular person, and evidence is receivable to show it. Hans Rees' Sons v. North Carolina ex rel. Maxwell, 283 U. S. 124, 51 S. Ct. 385, 75 L. Ed. 879. No such showing has in our judgment been made here.

Decree affirmed.